UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALFRED SPOONER and FAIR HOUSING JUSTICE CENTER, INC., | |
| Plaintiffs, | 1:18-cv-01564 (KBF) |
| v. | |
| GOLDFARB PROPERTIES, INC.; DEEGAN TWO COMPANY; CEDAR TWO COMPANY, LLC. | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ......................................................................................ii-iv

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND..........................................................................................3

LEGAL STANDARD.....................................................................................................6

ARGUMENT .................................................................................................................7

     I.     PLAINTIFFS HAVE PLED A PLAUSIBLE DISPARATE
          IMPACT CLAIM.....................................................................................8

     II.    PLAINTIFFS HAVE PLED A VIABLE INTENTIONAL
          DISCRIMINATION CLAIM ...............................................................18

     III.   DEFENDANTS DO NOT CHALLENGE PLAINTIFFS'
          CITY LAW CLAIMS ON THE MERITS.............................................23

CONCLUSION.............................................................................................................24

TABLE OF AUTHORITIES

**Cases**

*Alexander v. Choate,*
    469 U.S. 287 (1985)...........................................................................................7

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...........................................................................................6

*Barrett v. Forest Labs., Inc.,*
    39 F. Supp. 3d 407 (S.D.N.Y. 2014).................................................................16

*Bell Atl. Corp., v. Twombly,*
    550 U.S. 544 (2007)...........................................................................................6

*Boykin v. Fenty,*
    650 F. App'x 42 (D.C. Cir. 2016)....................................................................15

*Boykin v. Keycorp,*
    521 F.3d 202 (2d Cir. 2008)..........................................................................7, 17

*Bumpus v. N.Y.C. Transit Auth.,*
    18 Misc. 3d 1131A (Sup. Ct., Kings County Feb. 13, 2008)............................24

*Cales v. New Castle Hill Realty,*
    No. 10-CV-3426, 2011 WL 335599 (S.D.N.Y. Jan. 31, 2011) ........................22

*Columbus Bd. of Educ. v. Penick,*
    443 U.S. 449 (1979)....................................................................................18, 19

*DiFolco v. MSNBC Cable LLC,*
    622 F.3d 104 (2d Cir. 2010)...............................................................................6

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.,*
    135 S. Ct. 2028 (2015)......................................................................................13

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.,*
    316 F.3d 357 (2d Cir. 2003)...............................................................................7

*Fair Hous. Justice Ctr., Inc. v. Allure Rehab. Servs. LLC,*
    No. 15-CV-6336, 2017 WL 4297237 (E.D.N.Y. Sept. 26, 2017) .....................6

*Fair Hous. Justice Ctr., Inc. v. Silver Beach Gardens Corp.,*
    No. 10-CV-912, 2010 WL 3341907 (S.D.N.Y. Aug. 13, 2010).........................6

*Gillman v. Inner City Broad. Corp.*,
    No. 08-CV-8909, 2009 WL 3003244 (S.D.N.Y. Sept. 18, 2009)..................................... 7

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*,
    844 F.2d 926 (2d Cir. 1988)................................................................................... 17

*Jenkins v. N.Y.C. Transit Auth.*,
    646 F. Supp. 2d 464 (S.D.N.Y. 2009).......................................................... 9, 16

*Johnson v. Levy*,
    812 F. Supp. 2d 167 (E.D.N.Y. 2011) .......................................................... 23

*Keith v. Volpe*,
    858 F.2d 467 (9th Cir. 1988) ......................................................................... 17

*L.C. v. LeFrak Org., Inc.*,
    987 F. Supp. 2d 391 (S.D.N.Y. 2013) ........................................................ 7, 12

*Mancuso v. Douglas Elliman LLC*,
    808 F. Supp. 2d 606 (S.D.N.Y. 2011).......................................................... 23

*Mencer v. Princeton Square Apartments*,
    228 F.3d 631(6th Cir. 2000) ........................................................................ 23

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
    819 F.3d 581 (2d Cir. 2016)............................................................................ 8

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
    715 F.3d 102 (2d Cir. 2013)......................................................................... 23

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*,
    658 F.3d 375 (3d Cir. 2011)......................................................................... 17

*Muhammad v. N.Y.C. Transit Auth.*,
    52 F. Supp. 3d 468 (E.D.N.Y. 2014) ........................................................... 13

*New York City Environmental Justice Alliance v. Giuliani*,
    214 F.3d 65 (2d Cir. 2000)............................................................................ 15

*People v. Jeanty*,
    94 N.Y.2d 507 (2000) ................................................................................... 20

*Puello v. Bureau of Citizenship and Immigr. Servs.*,
    511 F.3d 324 (2d Cir. 2007).......................................................................... 21

*Ryan v. Ramsey*,
    936 F. Supp. 417 (S.D. Tex. 1996) ............................................................... 9

*Sanders v. Grenadier Realty, Inc.*,
    367 F. App'x 173 (2d Cir. 2010) .................................................................................. 23

*Schanz v. Vill. Apartments*,
    998 F. Supp. 784 (E.D. Mich. 1998).......................................................................... 23

*Short v. Manhattan Apartments, Inc.*,
    916 F. Supp. 2d 375 (S.D.N.Y. 2012)................................................................... 14, 15

*Smith v. Xerox Corporation*,
    196 F.3d 358 (2d Cir. 1999)....................................................................................... 14

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002)............................................................................................ 6, 8, 9

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    135 S. Ct.  2507 (2015)................................................................................................. 7

*Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*,
    135 S. Ct. 2507 (2015)............................................................................................... 15

*Town of Huntington v. Huntington Branch, N.A.A.C.P.*,
    488 U.S. 15 (1988).................................................................................................... 17

*Tsombanidis v. W. Haven Fire Dep't*,
    352 F.3d 565 (2d Cir. 2003)................................................................................ passim

*United States v. Bannister*,
    786 F. Supp. 2d 617 (E.D.N.Y. 2011) ....................................................................... 18

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977).................................................................................................. 18

*Winfield v. City of New York*,
    No. 15-CV-5236, 2016 WL 6208564 (S.D.N.Y. Oct. 24, 2016)...................................... 8

## Statutes & Regulations

24 C.F.R. § 100.500 ............................................................................................................. 7

42 U.S.C. § 3604 ................................................................................................................. 7

New York City, N.Y., Code § 8-107 .................................................................................... 19

Plaintiffs Alfred Spooner and the Fair Housing Justice Center ("FHJC") submit this brief in opposition to Defendants' motion to dismiss Plaintiffs' First Amended Complaint.

## PRELIMINARY STATEMENT

Defendants distort the Fair Housing Act ("FHA") and ignore the appropriate pleading standard in their desperate attempt to dismiss Plaintiffs' Amended Complaint.  Plaintiffs have alleged statistics and facts sufficient to create a reasonable inference of both disparate impact and intentional discrimination under the FHA.  Plaintiffs are not required to meet the FHA's evidentiary burdens at the pleading stage, and at no point do Defendants even dispute whether Plaintiffs' disparate impact claims are plausible, or sufficient to put Defendants on notice of the basis for their liability.

Plaintiff Alfred Spooner is a disabled person who receives a state-funded rental subsidy, the Olmstead Housing Subsidy ("OHS"), which is provided exclusively to low-income persons with disabilities.  While the state guarantees payment of the vast majority of Mr. Spooner's rent, Defendants, a large New York-based rental management company and the owners of two apartment buildings,[1] still denied Mr. Spooner's rental application because he did not meet their income requirement of forty-three times the rent.  Earning this level of income is a practical impossibility for all persons receiving Mr. Spooner's subsidy, all of whom are disabled.  Upon learning of Mr. Spooner's plight, Plaintiff FHJC conducted a testing investigation that confirmed Goldfarb's policy was not limited to Mr. Spooner and his subsidy, but also applied to other housing subsidies, including HIV/AIDS Services Administration ("HASA") subsidies, another

---

[1] Defendant Goldfarb manages approximately 6,000 units in New York City and its surrounding suburbs.  All properties managed by Goldfarb are owned by separate closely-held entities, including Defendants Deegan Two Company and Cedar Two Company, LLC, both of which operate from the same location as Goldfarb.  For ease of reference, Defendants are collectively referred to as "Goldfarb" throughout.

1

subsidy provided exclusively for persons with disabilities, and Section 8 vouchers, which are used by many low-income disabled persons throughout New York City.

Faced with these facts, Goldfarb argues that its policy has an adverse impact only on persons who use these government-funded housing subsidies (itself a blatant violation of New York City law), not persons with disabilities.  Yet, Goldfarb disregards the statistics pled in Plaintiffs' complaint which illustrate that Goldfarb's blatant source-of-income discrimination disproportionately impacts persons with disabilities.  Goldfarb also ignores the obvious relationship between its refusal to accept OHS and HASA and its disability discrimination, as Plaintiffs have pled that *all persons* who use OHS and HASA are disabled.

Trying to distract from the obvious inference of a disparate impact caused by its policy, Goldfarb pretends that this case is post-discovery and relies exclusively on inapposite rulings at summary judgment or after bench trials where courts found that the plaintiffs had not offered an adequate statistical framework to show the discriminatory effect of a defendant's policy under the FHA.  Defs.' Mot. to Dismiss ("Defs.' Br.") 4-8.  When assessed for what they are— pleadings in which Plaintiffs must only show plausibility, not set forth a prima face case of discrimination—Plaintiffs' allegations are more than adequate to state a claim for relief.  *See* Argument *infra* Section I.

With regard to Plaintiffs' claims for intentional discrimination, Plaintiffs directly informed Goldfarb of the discriminatory effect of its policy prior to filing this lawsuit, yet Goldfarb made no changes.  Even without these direct warnings, Goldfarb, as a larger rental management company, knows or should know the various public rental subsidies used by low-income renters in New York City.  Goldfarb cannot plausibly claim that its continued refusal to rent to persons with disability-based housing subsidies was unintentional.  Moreover, Plaintiffs

have pled that Goldfarb knew the effect of its income requirement after a related lawsuit only

three years ago.  Yet Goldfarb raised its minimum income requirement to make it impossible for

disabled persons using OHS, HASA, or Section 8 to rent its apartments.  *See* Argument *infra*

Section II.

**FACTUAL BACKGROUND**

Mr. Spooner is a sixty-eight-year-old former salesman whose cancer diagnosis and

subsequent medical treatment cost him both his job and his apartment.  Am. Compl. ¶¶ 29-30.

Finally ready to move out of a nursing home, Mr. Spooner sought out state-funded housing

programs that would allow him to live independently.  *Id.* ¶¶ 33-34.  Mr. Spooner was successful

in these endeavors and, in early March 2017, he was deemed eligible for OHS, a rental subsidy

designed for people in Mr. Spooner's exact situation—disabled, low-income persons living in

nursing homes and seeking to reintegrate back into the community.  *Id.* ¶ 34.

In order to be eligible for OHS, a person must 1) be age 55 or older or be age 18 or older

with a documented chronic disability; 2) be enrolled in Medicaid; 3) be in need of "nursing home

level of care" as determined by the Uniform Assessment System for New York; 4) be living in a

nursing home presently or be homeless or unstably housed; 5) have spent at least 120

consecutive days in a nursing home over the most recent two-year period; and 6) have the ability

to live safely in the community.  *Id.* ¶ 23.  Any person who qualifies for "nursing home level of

care" pursuant to OHS is, by definition, disabled for purposes of the FHA.  *See id.* ¶¶ 23-27

(laying out the criteria for "nursing home of level of care" under New York's Uniform

Assessment System and for disability under the FHA).  Because all OHS recipients receive

Medicaid, they, by definition have, extremely low incomes.  *Id.* ¶ 28.  Medicaid income

thresholds are particularly low for single adult households like Mr. Spooner, who can earn up to

only approximately $16,000 per year and still qualify for Medicaid.  *Id.*  Consequently, OHS

3

recipients like Mr. Spooner do not have sufficient income to rent most market-rate multi-family rental housing in New York City without some form of public rental assistance.

OHS recipients are responsible for locating an apartment to rent and, once an apartment is approved by the OHS program operator, they are required to only pay 30% of their income (usually Social Security or Social Security Disability) towards rent. *Id.* ¶ 22. OHS then directly pays the landlord the remainder of the recipients' rent each month. *Id.* Recipients must pay their portion of the rent on time at the risk of losing their subsidy. *Id.* Because OHS has already screened recipients to ensure they are able to pay 30% of their income towards rent and the state guarantees the remainder, landlords receive the same amount of rent and similar, if not greater, assurance of payment as renting to a tenant paying the full rent from employment earnings.

Once approved by OHS, Mr. Spooner applied for two apartments within the OHS program's rent range in buildings managed by Goldfarb. *Id.* ¶¶ 35-37. Goldfarb rejected Mr. Spooner's application, stating that he did not meet its income requirement because he did not earn forty-three times the full monthly rent in annual income. *Id.* ¶ 39. An employee of the Center for Independence of the Disabled NY assisting Mr. Spooner, Zola Mendoza, explained to Goldfarb that all OHS recipients are required to be low-income and therefore cannot earn forty-three times the rent and still be eligible for the OHS rental subsidy. *Id.* Ms. Mendoza explained to Goldfarb that its policy was tantamount to a refusal to accept OHS. *Id.* Goldfarb ignored this information. *Id.* Ms. Mendoza also asked Goldfarb if its income requirement could be applied only to the portion of the rent Mr. Spooner would pay himself. She was told no, and that Mr. Spooner would have to earn forty-three times the total rent even though he would only pay 30% of his income under OHS guidelines and OHS would pay the remainder, and largest portion, of the rent. *Id.* Four months later, Mr. Spooner and Ms. Mendoza learned of additional available

4

apartments for rent within the approved OHS price range in Goldfarb's buildings and inquired if Mr. Spooner would be considered. *Id.* ¶ 41. Goldfarb told them yet again that Mr. Spooner would be denied if he did not earn forty-three times the full rent in income, irrespective of subsidy use. *Id.* ¶ 43. Mr. Spooner remained without an apartment, eventually ending up in a homeless shelter. *Id.* ¶ 44.

After learning of Mr. Spooner's situation, FHJC directed testers to inquire about apartments in various buildings managed by Goldfarb. *Id.* ¶ 4. During this investigation, which ran from August to October 2017, FHJC testers posed as persons whose family members either received OHS, HASA, or Section 8 rental subsidies. *Id.* ¶¶ 45-53. FHJC's testing confirmed that Goldfarb applies its policy of requiring applicants to have a monthly income that is forty-three times the rent to all applicants with OHS, HASA, and Section 8 rental subsidies—an effective refusal to accept these subsidies. *Id.* This refusal has a disparate effect on persons with disabilities, as 100% of OHS and HASA recipients are disabled, and statistics from the New York Consolidated Plan[2] and reports issued by the various subsidy and voucher programs reflect that the percentage of disabled households in New York City using OHS, HASA, and Section 8 (approximately 39.5%) far exceeds the percentage of the non-disabled households (approximately 4%) using these same subsidies. *Id.* ¶¶ 86-87.

This was not FHJC's first foray with Goldfarb. In late 2014 and early 2015, FHJC received multiple complaints from HASA recipients that Goldfarb openly refused their subsidies, an allegation that was confirmed by testing. *Id.* ¶¶ 54-58. Goldfarb was sued in state court (by a prospective renter, not FHJC) and reached a settlement agreeing, in part, that it would not refuse

---

[2] The first citation to the December 2016 New York City Consolidated mistakenly appears at Paragraph 77 rather than Paragraph 75 of the Amended Complaint. All cited statistics in Paragraphs 75-78 of the Amended Complaint are drawn from the 2016 Consolidated Plan.

to rent to HASA subsidy recipients. *Id.* ¶ 59. At the time that lawsuit was filed, Goldfarb

imposed a minimum income requirement of thirty-five times the rent. *Id.* at 58. Following the

settlement agreement, however, Goldfarb raised its minimum income requirements to forty-three

times the rent, *id.* ¶ 60, an increase that put its income requirement above New York City's

standard forty times the rent requirement, *id.* ¶ 70. When Goldfarb's income requirement is

calculated properly under the New York City Human Rights Law (NYCHRL), this increase to

forty-three times the rent makes it impossible for OHS, HASA, or Section 8 recipients to rent an

apartment in Defendants' buildings. *Id.* ¶¶ 61-70.

     Seeking to remedy these discriminatory policies, Mr. Spooner and FHJC filed the instant

suit, asserting violations of the Fair Housing Act and New York City Human Rights law.

## LEGAL STANDARD

     In deciding a Rule 12(b)(6) motion, a court must "accept[] all factual allegations as true,

and draw[] all reasonable inferences in the plaintiff's favor." *DiFolco v. MSNBC Cable LLC*,

622 F.3d 104, 110-11 (2d Cir. 2010) (internal quotations omitted). A claim will survive a motion

to dismiss so long as it is facially plausible and gives fair notice to a defendant of the basis for

the claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp., v. Twombly*, 550 U.S.

544, 570 (2007). Where factual allegations permit a court to draw a reasonable inference of

plausible, not probable, liability, then a claim should not be dismissed. *Iqbal*, 556 U.S. at 678.

*See also Fair Hous. Justice Ctr., Inc. v. Allure Rehab. Servs. LLC*, No. 15-CV-6336, 2017 WL

4297237, at *6 (E.D.N.Y. Sept. 26, 2017); *Fair Hous. Justice Ctr., Inc. v. Silver Beach Gardens*

*Corp.*, No. 10-CV-912, 2010 WL 3341907, at *5 (S.D.N.Y. Aug. 13, 2010) (denying motions to

dismiss FHA discrimination claims).

     Plaintiffs need not establish a prima facie case of discrimination at the pleadings stage.

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). While discrimination claims apply the

*McDonnell Douglas* burden-shifting framework, that standard is an evidentiary standard, not a pleading requirement, and plaintiffs are not required to establish each *McDonnell Douglas* prima facie element in their Complaint.  *Boykin v. Keycorp*, 521 F.3d 202, 212 (2d Cir. 2008); *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 366 (2d Cir. 2003). Plaintiffs must only "give fair notice" of the basis for their claims and assert claims that are facially plausible.  *Gillman v. Inner City Broad. Corp.*, No. 08-CV-8909, 2009 WL 3003244, at *3 (S.D.N.Y. Sept. 18, 2009); *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 401 (S.D.N.Y. 2013).

## ARGUMENT

The FHA proscribes that landlords may not "discriminate in the sale or rental, or . . . otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap[3] of . . . that buyer or renter."  42 U.S.C. § 3604(f)(1).  This prohibition prevents both intentional discrimination and policies that have a disparate impact on protected classes.  *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct.  2507, 2521 (2015); 24 C.F.R.§ 100.500(a) and (c).  Disparate impact claims have been recognized as especially important for persons with disabilities like Mr. Spooner to be able to vindicate their rights, as "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference-of benign neglect."  *Alexander v. Choate*, 469 U.S. 287, 295 (1985).  Here, Plaintiffs have pled viable claims for disability discrimination based under both disparate impact and intentional discrimination theories.

---

[3] The term "disability" is used throughout this memorandum of law instead of the term "handicap" except where quoting from the statutory text.

## I.   PLAINTIFFS HAVE PLED A PLAUSIBLE DISPARATE IMPACT CLAIM

The elements of a prima facie claim based on disparate impact are "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016).  As noted above, however, the prima facie case is "an evidentiary standard, not a pleading requirement" and, "at the pleading stage . . . 'a complaint must include only a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Winfield v. City of New York*, No. 15-CV-5236, 2016 WL 6208564, at *5 (S.D.N.Y. Oct. 24, 2016) (quoting *Swierkiewicz*, 534 U.S. at 516).

Goldfarb premises its motion to dismiss on two overly restrictive views of disparate impact liability.  First, it argues that Plaintiffs have not stated a claim because they have not pled that Goldfarb's policy has a disparate impact on the entire disabled population of New York City, including both housing renters and home owners.  Defs.' Br. 4.  Second, Goldfarb claims that Plaintiffs have not stated a claim because they have not pled facts illustrating that a disparate proportion of all persons excluded from Defendants' buildings as a result of Goldfarb's income requirements are persons with disabilities.  Defs.' Br. 6.  Plaintiffs are not required to make either of these showings.

A plaintiff states a viable disparate impact claim by alleging facts from which the court may infer that a defendant's practice or policy has a "significantly adverse" impact on a protected class of persons—"qualitative" disparate impact.  *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575-78 (2d Cir. 2003).  In the alternative, a plaintiff may also plead a "quantitative" form of disparate impact, i.e., alleging that a defendant's policy has a "disproportionate impact" on a protected class of persons when compared to a non-protected class.  *Id.*  While statistical evidence is often necessary to ultimately prove a disparate impact

claim, it is "inappropriate to require a plaintiff to produce statistics [at the motion to dismiss stage] before the plaintiff has had the benefit of discovery." *Jenkins v. N.Y.C. Transit Auth.*, 646 F. Supp. 2d 464, 469 (S.D.N.Y. 2009) (citing *Swierkiewicz*, 534 U.S. at 511-12).

Plaintiffs have identified a requisite practice or policy: Goldfarb's facially neutral requirement that all prospective tenants earn forty-three times the monthly rent in annual income. Am. Compl. ¶¶ 39, 45-46.  Plaintiffs also have pled facts that reflect that this policy operates as a policy to reject OHS or HASA as it is impossible for a person to be eligible to receive one of these two rental subsidies and earn an income of forty-three times the full monthly rent in one of Goldfarb's buildings.[4]  *Id.* ¶¶ 65-67.  This policy of course has a "significantly adverse" impact on persons with disabilities as compared to persons without disabilities, as 100% of persons who receive OHS and HASA subsidies are disabled.  Goldfarb's argument—that a neutral policy which prevents it from accepting two rental subsidies created exclusively for persons with disabilities somehow is not "significantly adverse" to persons with disabilities—is contrary to both the law and to common sense.  *See Ryan v. Ramsey*, 936 F. Supp. 417, 427 (S.D. Tex. 1996) (rejecting motion to dismiss disparate impact claim because "even if the defendants' real interest was to ensure that only persons who were currently employed, rather than those receiving Social Security disability benefits, could rent their apartments, an individual's status as a Social Security disability benefit recipient is inextricably linked to his status as a disabled person").

---

[4] Goldfarb does not appear to dispute the proposition that its minimum income policy is effectively a policy not to accept OHS or HASA subsidies.  To the extent it attempts to make the argument here made by many of its employees throughout the testing investigation—that it accepts all housing subsidies so long as the person also earns forty-three times the rent—this claim is meritless.  As explained above and in the Complaint, Goldfarb has created a minimum income requirement that, by both design and operation, makes it impossible for persons to both be eligible for these subsidies and to earn the minimum income that Goldfarb requires.

Plaintiffs have also pled a quantitative form of disparate impact, by alleging that Goldfarb's policy has a "disproportionate impact" on disabled persons using OHS, HASA, and Section 8 as compared to non-disabled persons using the same subsidies. The seminal Second Circuit case of *Tsombanidis v. West Haven Fire Department*, 352 F.3d 565 (2d Cir. 2003), is instructive on the appropriate comparison. In *Tsombanidis*, the plaintiffs alleged that the City of West Haven's policy restricting certain group homes had a disparate impact on persons with disabilities—namely, persons recovering from alcohol or drug addiction who benefitted from programs taking place in these group homes. The *Tsombanidis* Plaintiffs did not allege that the City's policy affected *all disabled persons* as Goldfarb argues is required in this case. Instead, they alleged the City's neutral policy adversely impacted group homes serving *a subgroup of the disabled population*, i.e. persons recovering from addiction. *Id.* at 575-77. When framing the appropriate analysis, the Second Circuit explained that Plaintiffs could make out a disparate impact claim if they could show:

> (1) that *x%* of all of the recoverings in West Haven need (or have good reason) to live in the "group settings" prohibited by the facially neutral fire regulations at issue, (2) that *y%* of all of the non-recoverings in West Haven need (or have good reason) to live in such group settings prohibited by the fire regulations, and, crucially, (3) that *x* is significantly greater than *y*.

*Id.* at 577. The relevant question was not, as Goldfarb proposes here, whether West Haven's policy had a disparate impact *on all persons with disabilities*, or whether the policy affected persons with disabilities disproportionately *in the entire population of persons that were unable to live in groups homes*. Rather, the question was whether the policy had a disparate impact on the sub-class of persons who, because of their disability (recovery from drug or alcohol addiction), "need or have good reason to live in the group setting" as compared to the subclass of persons who are not disabled by recovery from addiction who also "need or have good reason to

live in a group setting." In other words, the Circuit made clear that there must be an apples-to-apples comparison when assessing a disproportionate impact, and disabled persons seeking to live in a group home should only be compared to non-disabled persons *who also seek to live in a group home*.

So too here, persons like Mr. Spooner who are disabled and can afford to pay Goldfarb's rent using OHS, HASA and Section 8 should only be compared to similarly situated non-disabled persons: renters also using OHS, HASA, or Section 8. As illustrated in the complaint, the percentage of disabled households in New York City using OHS, HASA, and Section 8 (39.5%) far exceeds the percentage of the non-disabled households using these same subsidies (4%). Am. Compl. ¶¶ 86-87. Under the Second Circuit's controlling *Tsombanidis* framework, no allegations with respect to the broader population of all New York City residents or applicants for Defendants' apartments who do not use housing subsidies are required.

This framework is also logical because it ensures that only persons actually affected by the Defendants' policy are considered in the disparate impact analysis. For example, there are undoubtedly disabled persons in New York City with no income and no subsidy (such that they cannot afford to rent from Defendants) and disabled persons that own homes or live with family (such that they are not in the rental housing market). By comparing only persons with disabilities using the housing subsidies at issue to persons without disabilities using those same subsidies, the Second Circuit's proscribed comparison allows for the appropriate "causal analysis between the claim of discrimination based on the handicap in question and the facially neutral policy." *Tsombanidis*, 352 F.3d at 577.

Judge Cote's decision in *L.C. v. LeFrak Organization, Inc.,* 987 F. Supp. 2d 391 (S.D.N.Y. 2013), illustrates an appropriate application of this framework at the pleading stage. In *LeFrak*, a HASA recipient and FHJC alleged that the defendant's policy of submitting persons using HASA subsidies to a more burdensome rental process had a disparate impact on persons with disabilities. *Id.* at 402. The Court held that the plaintiffs stated a viable disparate impact claim by "put[ting] defendants on notice that [their] alleged basis for disparate impact is that the percentage of the HIV population in New York City on housing subsidies exceeds the percentage of the non-HIV New York City population on housing subsidies." *Id.* at 402–03. The fact that the plaintiffs' allegations reflected a disparate impact on only a *subgroup of the disabled population*—i.e. persons with HIV—rather than the entire disabled population in New York City played no role in the Court's analysis. In framing the appropriate comparison, the Court did not compare the HIV population using housing subsidies to all potential renters who do not have HIV, but only to persons without HIV but *also using housing subsidies*.

Plaintiffs have made the *identical* allegations here. They have alleged facts to put Goldfarb on notice that the basis for disparate impact liability is that the percentage of the disabled households in New York City using OHS, HASA, and Section 8 to pay their rent exceeds the percentage of the non-disabled New York City households using these same subsidies. Following *LeFrak*, Plaintiffs have unquestionably stated a viable "quantitative" disparate impact claim.

Goldfarb mounts three unpersuasive attacks on Plaintiffs' Amended Complaint. First, Goldfarb tries to distract the Court by arguing that Plaintiffs are still bound by the allegation in their original complaint that "Defendants' minimum annual income policy has no adverse impact based on disability on New York City residents generally." Defs.' Br. 4-5. Plaintiffs do not

12

dispute the accuracy of this prior allegation, but it is legally irrelevant.  As explained above,

Plaintiffs do not, and never have, challenged Defendants' policy on the grounds that it has a

disparate impact on the entire disabled population of New York City.  Rather, they assert that it

has a disparate impact on the subgroup of disabled persons using OHS, HASA and Section 8 to

pay their rents.  Am Compl. ¶¶ 75-88.  Plaintiffs have alleged more than enough to state a claim

of disparate impact discrimination on this subgroup, and Defendants' nigh-frivolous argument

that Plaintiffs must allege a disparate impact on the entire New York City disabled population

must be rejected.  *See, e.g.*, *Tsombanidis*, 352 F.3d at 577; *LeFrak*, 987 F. Supp. 2d at 402-03.

Second, Goldfarb attempts to argue that there is no such thing as a disparate impact claim

on behalf of a subgroup of a protected class, going as far as conceding that Plaintiffs "allege . . .

[a disparate impact] on a select subgroup of disabled individuals."  Defs.' Br. 6.  This argument

is clearly belied by the binding analysis set forth by the Second Circuit in *Tsombanidis* and Judge

Cote's persuasive analysis in *LeFrak*,[5] among other cases in the analogous Title VII context

acknowledging the viability of disparate impact claims on behalf of a subgroup of a protected

class.  *See, e.g.*, *Muhammad v. N.Y.C. Transit Auth.*, 52 F. Supp. 3d 468, 485 (E.D.N.Y. 2014)

(holding plaintiff could state disparate impact claim based on policy that had disproportionate

effect on Muslim women—i.e., a subset of a protected class under the relevant anti-

discrimination law); *cf. E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2038

(2015) (Thomas, J., concurring in part and dissenting in part) (referring to a policy that "fall[s]

more harshly on [the subclass of] those who wear headscarves as an aspect of their faith" as "the

classic case of an alleged disparate impact").

---

[5] It is notable that, even after Plaintiffs cited to *Tsombanidas*'s and *LeFrak*'s controlling and persuasive effect in opposition to Defendants' prior motion to dismiss, *see* Dkt. #33 at 9-11, Defendants still make no reference to either case in their renewed motion.

None of the cases cited by Goldfarb, all of which were decided at summary judgment or post-trial motions, compel otherwise.  In *Smith v. Xerox Corporation*, 196 F.3d 358 (2d Cir. 1999), plaintiffs, workers who had been laid off by Xerox, claimed that Xerox's process for effecting layoffs had a disparate impact on older men.  *Id.* at 364.  While the plaintiffs were challenging the effect of the layoffs company-wide, their expert only performed an analysis of the layoffs in certain individual divisions within the company.  *Id.* at 368.  The Court rejected this evidence at summary judgment, explaining that isolating some individual groups within the company could not demonstrate a company-wide impact.  Without statistics illustrating the effect of the layoff policy across a broader section of the company, the court could not "reasonably infer from statistics based on a sub-set of work-groups that the [lay-off policy] caused the observed disparate impact, rather than some other factor relevant only to those work-groups."  *Id.* at 369.

The Second Circuit's analysis in *Smith* has no bearing on this case.  By analogizing to *Smith*, Goldfarb conflates two distinct concepts with respect to pleading a disparate impact claim based on a subset of a protected class.  Plaintiffs do not do what the Second Circuit rejected in *Smith*, because they do not cherry pick favorable data from a subset of a protected class and then argue that this data must apply to the class as a whole.  Rather, they have pled that Goldfarb's policy has a disparate impact on only a subset of a protected class—disabled persons who are able to pay Goldfarb's rent using an OHS, HASA, or Section 8 subsidy, but have their rental applications denied nonetheless due to Goldfarb's discriminatory policy.

Goldfarb's reliance on *Short v. Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375 (S.D.N.Y. 2012), is equally misplaced.  In *Short*, the Court concluded after trial that the plaintiffs did not present sufficient evidence of a correlation between persons with disabilities and persons

using a rental subsidy to show that the defendant's policy of not showing certain apartments to persons with any type of rental subsidy had a disparate impact on persons with disabilities. *Id.* at 393. In fact, Plaintiffs in *Short* did not present any comparative data such as the percent of rental subsidy holders with a disability compared to those subsidy holders without a disability. In contrast, Plaintiffs here have alleged facts to support the inference of exactly such a correlation with respect to OHS, HASA, and Section 8 (that 39.5% of disabled households use OHS, HASA, and Section 8 as compared to only 4% of non-disabled households). *See* Am. Compl. ¶¶ 75-88. To analyze allegations focused on discrimination against a subgroup of a protected class (i.e., persons with disabilities using OHS, HASA and Section 8) at the pleading stage, *LeFrak* provides the correct framework. *See* 987 F. Supp. 2d at 402.

Nothing in the additional two cases cited by Goldfarb, *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015) and *New York City Environmental Justice Alliance v. Giuliani*, 214 F.3d 65 (2d Cir. 2000), changes this analysis. Both cases stand for the general proposition that a plaintiff must allege a causal connection between the challenged policy and the disproportionate impact on a protected class. Plaintiffs agree and have done so in this case. They have alleged that Goldfarb's policy has a disparate impact on persons who are able to pay Goldfarb's rents using certain housing subsidies and that the "the percentage of the [disabled] population in New York City on [the relevant] housing subsidies exceeds the percentage of the non-[disabled] New York City population on [the same] subsidies." *LeFrak*, 987 F. Supp. 2d at 402-03; *see also* Am. Compl. ¶¶ 75-88.[6]

---

[6] Goldfarb's reliance on the D.C. Circuit's non-precedential opinion in *Boykin v. Fenty*, 650 F. App'x 42 (D.C. Cir. 2016), is misplaced for the same reason. There, the plaintiffs alleged only that a District of Columbia policy had a disproportionate impact on homeless persons without showing a relationship between homeless persons and persons with disabilities. *Id.* at 44. Here, the Plaintiffs have alleged both that Goldfarb's policy has a disparate impact on persons using specific housing subsidies *and*, unlike the plaintiffs in *Boykin*, that discriminating against persons with those subsidies has a disproportionate impact on persons with disabilities. *See* Am. Compl. ¶¶ 75-88.

While Defendants also assert that Plaintiffs have not alleged that tenants who do qualify under Defendants' income policy are proportionately less disabled than those who do not, Defs.' Br. 7, no such allegation is necessary, nor is it knowable without discovery into Defendants' actual rental practices. *Jenkins v. New York City Transit Auth.*, 646 F. Supp. 2d 464, 469 (S.D.N.Y. 2009) (holding plaintiffs cannot be required to plead unknowable statistics without "the benefit of discovery"); *Barrett v. Forest Labs., Inc.,* 39 F. Supp. 3d 407, 436 (S.D.N.Y. 2014) (same).  Again, Plaintiffs have alleged a disparate impact on the subgroup of disabled persons who are able to pay Defendants' rents using OHS, HASA, and Section 8, not the entire disabled population of New York City.  Plaintiffs have clearly alleged that disabled persons using these subsides cannot rent in Defendants' buildings under Defendants' minimum income policies. *See* Am. Compl. ¶¶ 45-53.  Just as the *Tsombanidis* Court did not consider whether there were persons with addiction who did not need to live in group homes and the *LeFrak* court did not consider whether there were persons with HIV not using HASA who were not subject to a more burdensome rental process, this court need not consider whether there are disabled persons who are outside of the subgroup of persons using OHS, HASA or Section 8 and are able meet Defendants' income requirements.  It has no bearing on the plausibility of Plaintiffs' allegations.

With no viable legal authority to support dismissal, Defendants attack Plaintiffs' math, claiming it is unreasonable to assume that the ratio of persons to households among the disabled population is similar to that ratio in the population at large (2.6:1).  Defs.' Br. 8; Am. Compl. ¶ 76.  Defendants misrepresent Plaintiffs' assumption, as this figure does not mean that all disabled persons live in "disabled-only" households, Defs.' Br. 8, but that disabled persons, like the rest of the population, live *on average* in groups of 2.6.  This number could just as easily

mean that the majority of disabled persons either live alone or in large group homes with other disabled persons and the average comes out to 2.6 per home—Defendants' claim that Plaintiffs' allegations reflect an assumption that disabled persons live only with other disabled persons is baseless and illogical.

It may be that the disabled population does not mirror the population at large in this regard but, as Defendants ignore throughout their motion papers, this is a motion to dismiss, not a motion for summary judgment.  Plaintiffs' statistics as pled at the very least create a reasonable inference of a disparate impact and are therefore sufficient at the motion to dismiss stage where Plaintiffs do not yet have the burden of putting forth a prima facie case.  *Boykin v. Keycorp*, 521 F.3d 202, 212 (2d Cir. 2008).  Plaintiffs have met their burden at the pleading stage and will be able to present more exacting statistics with the benefit of discovery when they put forward their prima facie case at summary judgment or trial.[7]

Plaintiffs have stated viable claims of both a qualitative disparate impact—as Defendants' policy has a clear significant adverse effect on OHS and HASA subsidy holders, 100% of whom are disabled, Am. Compl. ¶¶ 79-82—and a quantitative disparate impact, as the

---

[7] Using the statistics and the inferences drawn from them in Plaintiffs' Amended Complaint, 39.5% of disabled households use OHS, HASA or Section 8 subsidies as compared to only 4% of non-disabled households.  Even using Defendants' proposed "better" assumption that no disabled persons live in the same household, such that there are 800,000 disabled households (an absurd assumption considering the number of disabled adults who live together in group home arrangements), Defs.' Br. 8, Plaintiffs have still pled sufficient facts to draw a reasonable inference of disparate impact.  Defendants' proposed assumption still reflects that the percentage of disabled households using OHS, HASA, and Section 8 is 15.2% (121,773 disabled households using those subsidies/800,000 disabled households)—three times higher than the 4.9% non-disabled households using these subsidies and vouchers (107,404 non-disabled households using those subsides/2.2 million non-disabled households).  These numbers are still sufficient to reasonably infer a disparate impact at the pleading stage.  *See Huntington Branch, N.A.A.C.P. v. Town of Huntington,* 844 F.2d 926, 938 (2d Cir. 1988), *aff'd in part sub nom. Town of Huntington v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15 (1988) (nearly identical ratio of 24% vs 7% disparity probative of a disparate impact); *Keith v. Volpe*, 858 F.2d 467, 484 (9th Cir. 1988) (discriminatory effect shown when "[t]he failure to build the projects had twice the adverse impact on minorities as it had on whites"); *cf  Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011) (22.5% as compared to 2.73% sufficient to show prima facie disparate impact at summary judgment).

percentage of households using OHS, HASA and Section 8 subsidies (39.5%) is significantly higher than the percentage of non-disabled households using the same subsidies (4%), Am. Compl. ¶¶ 83-88.  These allegations are sufficient to create the reasonable inference of disparate impact discrimination and have provided Defendants fair notice of the basis for their liability.

## II.    PLAINTIFFS HAVE PLED A VIABLE INTENTIONAL DISCRIMINATION CLAIM

Plaintiffs have also pled a viable claim for intentional discrimination under the FHA. When determining whether a plaintiff has adequately pled discriminatory intent, courts consider the totality of relevant allegations, including direct and circumstantial facts, from which an inference of intent may be made.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  Allegations, such as those made here, of "[a]dherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence . . . is one factor among many others which may be considered by a court in determining whether an inference of [discriminatory] intent should be drawn."  *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 465 (1979) (internal quotations omitted); *see also United States v. Bannister*, 786 F. Supp. 2d 617, 666 (E.D.N.Y. 2011) (describing "foreseeability of such a discriminatory impact" as a relevant factor when assessing discriminatory intent).

Plaintiffs have alleged two factual bases for their claims of intentional discrimination. First, both Ms. Mendoza (on behalf of Mr. Spooner) and FHJC's testers directly informed Goldfarb that its minimum income requirement was effectively a refusal to accept OHS and HASA subsidies, two disability-based programs.  Am. Compl. ¶¶ 39, 46, 51-53.  Goldfarb had previously been sued for its failure to accept HASA, *id.* ¶ 59, and knew that all recipients of HASA are disabled.  *Id.*; *see also id.* ¶ 51.  As a large rental management company operating in New York City, it is also reasonable to infer that Goldfarb was familiar with housing subsidy

programs other than HASA, like OHS, including that they are intended solely for persons with disabilities.  *Id.* ¶ 73.  This is especially plausible in light of the New York City Human Rights Law ("NYCHRL"), which has banned landlords since 2008 from discriminating against renters based on their source of income, such as renters with housing subsidies and disability-based public sources of income.  New York City, N.Y., Code § 8-107(5)(a)(1).  One would think that a landlord of Goldfarb's size would have familiarized itself with the various subsidy programs that the city, state, and federal government offer in order to comply with the NYCHRL.

Nevertheless, "with full knowledge of the predictable effects of such adherence," Goldfarb continued to implement their policy and ignore the "foreseeable . . . discriminatory impact" it would have on the disabled persons for whom these subsidies were designed. *Columbus Bd. of Educ.,* 443 U.S. at 465; *Bannister,* 786 F. Supp. 2d at 666.  Goldfarb's motion to dismiss completely ignores the allegations that it was put on notice of the effect these policies had, yet did nothing.  Plaintiffs' intentional discrimination claim should be sustained on this basis alone.

Second, Plaintiffs allege that after Goldfarb settled a prior lawsuit regarding its refusal to accept HASA subsidies, Goldfarb raised its minimum income requirement from approximately thirty-five times the monthly rent in annual income to forty-three times the monthly rent in annual income.  Am. Compl. ¶¶ 54-60.  In its motion to dismiss, Goldfarb downplays this increase, arguing only that even under the prior thirty-five times the rent requirement, Mr. Spooner would be ineligible to rent a Goldfarb-managed apartment and, therefore, the change had no discriminatory effect on him.  *See* Defs.' Br. 9-14.  This analysis ignores that Goldfarb's manner of calculating prospective tenants' ability to pay violates the NYCHRL's prohibition on source of income discrimination.

Goldfarb's income calculation formula for renters with a housing subsidy is contrary to the NYCHRL because Goldfarb bases its calculation on the full rent amount instead of the portion of rent to be paid by the prospective tenant.  *See* Am. Compl. ¶ 39; Defs.' Br. 12.  When amending the NYCHRL to ban source of income discrimination, the City Council made clear that one of the very purposes of the law was to prevent discrimination against persons with rental subsidies.  As then-Council Member Bill DeBlasio explained:

> [T]he real point here was to ensure that we ended any possibility of discrimination against folks who had Section 8 or SSI, Social Security, any type of government income, both because it's right to stop that discrimination and stop any other discrimination guised in the form of that type of discrimination, and also, most importantly, to make sure that we do everything to help struggling low-income folks get affordable housing in this very difficult environment.

*Hearing on 61-A Before the Comm. on Gen. Welfare*, Jan. 8, 2008, at 3:16-3:23.  In order for a landlord to maintain a minimum income policy in compliance with New York City law, that policy would have to calculate the requirement based on the amount of rent that individual is paying per month himself or herself rather than the total rent.  Am. Compl. ¶¶ 65-66.  For example, Mr. Spooner, who only pays $231.15 per month in rent under his subsidy, *id.* ¶ 22, should not have been required to have an annual income sufficient to pay Goldfarb's full monthly rent.  Instead, Goldfarb should have evaluated whether Mr. Spooner's total yearly income was sufficient to pay his share of the rent.  *Id.* ¶¶ 66-67.

Goldfarb's method of calculating income would allow every landlord in New York City to evade and subvert the NYCHRL merely by adopting a minimum-income requirement that no individual using a government subsidy or voucher could meet.  This policy, which runs clearly afoul of the NYCHRL's purpose, cannot be deemed to comply with it.  *See People v. Jeanty*, 94 N.Y.2d 507, 516 (2000) ("It is certainly true that a statute should not be interpreted to nullify a portion of its mandate."); *Puello v. Bureau of Citizenship and Immigr. Servs.*, 511 F.3d 324, 327

20

(2d Cir. 2007) ("[W]e must construct an interpretation that comports with [the statute's] primary purpose and does not lead to anomalous or unreasonable results.") (citations and internal quotations omitted).  It is reasonable to infer at the pleading stage that Goldfarb must have been aware that its minimum income policy was contrary to the purposes of the NYCHRL, and thus, constitutes illegal source of income discrimination under City law.  Am. Compl. ¶¶ 66-67.

In light of the mandates of the NYCHRL, Goldfarb's raising its income requirement from thirty-five times the monthly rent to forty-three times the monthly rent in annual income becomes increasingly suspect.  All rental subsidy programs evaluate whether a tenant is income eligible for the program and then place a limit on both the total of amount of rent allowed and the total amount of the tenant's share of the rent.  *Id.* ¶ 61.  For example, the OHS and Section 8 programs typically require the subsidy-holder to pay 30% of his or her monthly income towards rent.  *Id.*  ¶¶ 62-63.  For HASA recipients, the City either pays 100% of the rent, or in certain circumstances requires the tenant to pay no more than 30% of his or her income.  *Id.* ¶ 64. Because each subsidy program has already financially evaluated and qualified each applicant to pay a specific portion of his or her income toward rent with the program paying the remainder of the rent, Goldfarb's higher income requirement serves no legitimate purpose.

Instead, Golfarb's decision to adopt a higher income requirement seems perfectly calibrated to be just high enough to exclude most applicants with vouchers or rental subsidies. This requirement would disqualify renters complying with subsidy program rules requiring them to pay no more than 30% of their monthly income in rent (in other words, persons who pay 30% of their monthly income towards rent by definition only earn forty times their monthly rent in annual income).  *See id.* ¶ 69.  In fact, at least in part for this very reason, New York City landlords typically only require that prospective tenants earn *forty* times their monthly rent in

annual income, and thus, subsidy holders paying 30% of their income towards rent are not categorically disqualified.  *Id.* ¶¶ 69-70.

Mr. Spooner is a case in point.  Mr. Spooner earns $770.50 per month, for an annual income of $9,246.  *Id.* ¶ 22.  This annual income of $9,246 is exactly forty times Mr. Spooner's monthly rent payment of $231.15, which represents 30% of his monthly income.  *Id.* ¶ 69. While Goldfarb argues that it cannot be held liable because it calculates its income requirement from the total rent rather than what the tenant actually pays, Defs.' Br. 11-14, Goldfarb cannot use a policy that violates city law to shield it from FHA liability.  *See Cales v. New Castle Hill Realty*, No. 10-CV-3426, 2011 WL 335599, at *5 (S.D.N.Y. Jan. 31, 2011)(rejecting defendant's proposed defense to FHA discrimination claim when defense would run afoul of NYCHRL). Even if it continues to calculate its income requirement based on its total rent because it has gotten away with it, Goldfarb is a sophisticated New York City landlord that knows that it should be calculating its income requirement from the amount the tenant would actually pay.  *Id.* ¶ 67. Goldfarb's raising its income requirement immediately after settling a source of income discrimination lawsuit to just above the standard forty times the rent threshold which would allow persons using OHS, HASA, and Section 8 to qualify to live in its buildings creates a plausible inference of intentional discrimination that warrants further exploration in discovery.

Lastly, Goldfarb treats Plaintiffs' Amended Complaint as though it is alleging that all income requirements are illegal, relying on a string of cases, most of which were decided after discovery, that stand only for the undisputed proposition that "[i]ncome or credit requirements do not inherently constitute unlawful discrimination."  Defs.' Br. 10.  Plaintiffs do not claim that all credit or income requirements constitute intentional discrimination.  Rather, Plaintiffs claim that Goldfarb's current income requirement is unlawful discrimination.  As explained above,

Plaintiffs assert that Goldfarb intentionally raised its minimum income requirement specifically to prevent persons with housing subsidies, persons whom it knows are disproportionately (and in some cases exclusively) disabled, as Mr. Spooner is, from ever being able to rent one of its apartments.[8]

## III. DEFENDANTS DO NOT CHALLENGE PLAINTIFFS' CITY LAW CLAIMS ON THE MERITS

Plaintiffs agree with Goldfarb that if all FHA claims are dismissed, this Court should not retain jurisdiction over Plaintiffs' remaining claims of disability and source of income discrimination under the NYCHRL. However, in deciding Goldfarb's motion, this Court should make no findings on the adequacy of Plaintiffs' Complaint regarding claims under the NYCHRL for two reasons. First, the basis for Goldfarb's motion to dismiss the Plaintiffs' NYCHRL claims is a lack of supplemental jurisdiction, not failure to state a claim. Defs.' Br. 14-16. Second, in its motion, Goldfarb does not substantively address either Plaintiffs' disability or source of income discrimination claims under the NYCHRL. The NYCHRL is broader than the FHA, and the Court should leave these claims undisturbed when Goldfarb has made no independent or substantive challenge to them. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) ("Courts must analyze NYCHRL claims separately and independently from any federal and state law claims."); *Bumpus v. N.Y.C. Transit Auth.*, 18 Misc.

---

[8] To the extent the cases cited by Goldfarb are relevant at all, they are easily distinguishable from the allegations at issue here. *See Sanders v. Grenadier Realty, Inc.*, 367 F. App'x 173, 176 (2d Cir. 2010) (dismissing FHA claim because, unlike this case, plaintiff failed to properly allege that she was entitled to housing subsidy); *Johnson v. Levy*, 812 F. Supp. 2d 167, 181 (E.D.N.Y. 2011) (dismissing claim when plaintiffs had not alleged any ability to pay the required rent beyond that they were "ready, willing, and able" to do so); *Mancuso v. Douglas Elliman LLC*, 808 F. Supp. 2d 606, 624 (S.D.N.Y. 2011) (assessing prima facie case of discrimination at summary judgment); *Mencer v. Princeton Square Apartments*, 228 F.3d 631, 635 (6th Cir. 2000) (assessing prima face case of discrimination after a bench trial in jurisdiction where, unlike New York, refusing to accept public assistance subsidies is not illegal); *Schanz v. Vill. Apartments*, 998 F. Supp. 784, 789 (E.D. Mich. 1998) (intentional disability discrimination claim rejected at summary judgment when plaintiff's only basis for claim was that landlord would not accept his third-party guarantor—not a housing subsidy used by persons with disabilities).

3d 1131A, at *3 (Sup. Ct., Kings County Feb. 13, 2008), *aff'd* 66 A.D.3d 26 (2d Dep't 2009)

("The New York City Human Rights Law sets forth a broad purpose.  The legislative history

contemplates that the Law be independently construed with the aim of making it the most

progressive in the nation.") (citations omitted).  While Plaintiffs vigorously maintain that federal

court is the appropriate forum for this case, if the Court were to grant Defendants' motion, all

NYCHRL claims should be dismissed without prejudice so that Plaintiffs may pursue them in

state court or before the New York City Human Rights Commission.

## CONCLUSION

For the above reasons, Plaintiffs respectfully request that Defendants' motion to dismiss

be denied.


Dated: June 27, 2018
       New York, New York

                                        EMERY CELLI BRINCKERHOFF
                                        & ABADY LLP


                                               /s/
                                        Diane L. Houk
                                        David B. Berman

                                        600 Fifth Avenue, 10th Floor
                                        New York, New York 10020
                                        (212) 763-5000

                                        *Attorneys for Plaintiffs Alfred Spooner*
                                        *and the Fair Housing Justice Center*


24